DAVID B. VOORHEES

*v.*

GEORGE BAILEY et al.

[Submitted October 7th, 1899.   Decided November 3d, 1899.
Filed March 24th, 1900.]

An auctioneer at an administrator's sale of real estate, being interested in having the property bring its full value, by fictitious bidding ran the bids up to about the full value and then knocked it off to one who had made no bid,

Voorhees v. Bailey.

whereupon the administrator, who had had no intention of buying, but who had advertised the sale thoroughly and therein acted in good faith, publicly assumed the bid, took possession at once and made valuable improvements. The heirs were all of age, and lived near, and complainant, who was one of them and the only one who asked to be relieved of the sale, made no objection to the court's approval of the sale a month later. The sale was confirmed, .conveyance made to the person declared to be the bidder by the auctioneer, who conveyed to defendant, one of the administrators. They filed an account charging themselves with the amount bid, exceptions were taken to the account by the complainant and it was confirmed. No bill to set aside the sale was filed for over a year, during which time complainant saw the administrator making improvements of a substantial character.—*Held*, that complainant was .estopped to claim that the sale was invalid, and to have it vacated.

Heard on pleadings and proofs in open court.

The complainant is one of nine children who are the heirs-at-law of Hendrick Voorhees, late of the county of Monmouth, who died on the 29th of October, 1896, intestate. The defendant George Bailey is one of the administrators of said deceased, ·and the other eight defendants are the brothers and sisters of the .complainant and co-heirs-at-law of said deceased, and one of them, Nelson T. Voorhees, is co-administrator with Bailey.

The object of the bill is to set aside a sale of real estate by the ·defendants Bailey and Nelson T. Voorhees, as administrators of Hendrick Voorhees, made on the 24th of March, 1897, by virtue of a previous order of the orphans court of Monmouth county for that purpose, to one Asher Curtis, and by him subsequently ·conveyed to the defendant George Bailey, on the ground (1) that the sale was fraudulently conducted by the administrators in such a manner as to prevent the property bringing its full value, and (2) that it was bought in at the sale by Curtis as the ·agent and figurehead of Bailey, and subsequently conveyed to him.

The bill calls for an answer from the administrators under .oath. The administrators severed in their answers and each ·denies the fraud, or that there was any agreement or understanding between Curtis and Bailey, before or at the sale, that ·Curtis should buy the property for Bailey.

The allegation of the bill is as follows:

---

Voorhees *v.* Bailey.

---

"And your orator further shows that the said Asher Curtis is a friend and a brother sea captain of the said George Bailey, one of the administrators aforesaid, and that it was arranged and agreed by and between them, the said George Bailey and Asher Curtis, prior to said sale, and at the time of the same, that he, the said George Bailey, one of the administrators as aforesaid, should himself become the purchaser of the said land, and that the same should be struck off and conveyed to the said Asher Curtis, and that he should then convey the same to the said George Bailey."

The answer of Bailey, the principal defendant, on this subject, is as follows:

"This defendant admits that said Asher Curtis is a friend of this defendant, but this defendant denies that there was any arrangement or agreement entered into or made or had between them at the time of or prior to said sale that this defendant should be or become the purchaser of said tract of land, or that said premises should be struck off and conveyed to said Asher Curtis, and that he should then convey them to this defendant."

And there is an interrogatory annexed to the bill, addressed to both defendants, as follows:

"Had you, or either of you, any conversation or understanding with Asher Curtis either before, or at, or during the time of the putting up and crying said lands for sale, in reference to, or in any way concerning the purchase of said lands? If so, what was that conversation, or the substance of it, and the whole of that substance? Did you, or either of you, direct, ask or request said Asher Curtis to bid for said lands at any time? Did you, or either of you, bid for said lands? Did you, or either of you, intimate to, authorize or direct said Asher Curtis, or anyone else, either by word, language, wink, nod, motion or expression of any kind, at any time, to bid for or buy said homestead and lands of said Hendrick Voorhees, deceased?"

Bailey's answer to that interrogatory is as follows:

"I had no conversation or understanding with Asher Curtis before or at the sale or the time of the putting up and crying of the lands known as the homestead in reference to or in any way concerning the purchase of said lands. At the sale the complainant attempted to buy the property for a small sum, and I said to Asher Curtis, I will make him pay for it, but I did not direct, ask or request said Curtis to bid on said lands at any time, and I did not do this by an intimation or authorization or by a direction by word, language, wink, nod, motion or expression of any kind, or any other indication which might suggest itself to the complainant to buy or bid on the lands of said Hendrick Voorhees."

The answer also denies all allegations of mismanagement at the sale, or contrivance to prevent the property from bringing its full value.

The sale took place March 24th, 1897, in complainant's presence, who was at once aware that Curtis' bid was assumed by Bailey; it was duly reported to the orphans court, and by it confirmed on April 29th, without objection. Bailey took immediate possession, and, after the confirmation, made considerable improvements. The administrators filed their account charging themselves with the amount bid at the sale. Complainant filed exceptions thereto, and after the allowance of the account by the orphans court, this bill was filed April 19th, 1898.

*Mr. William I. Chamberlain* and *Mr. Henry Chamberlain, Jr.*, for the complainant.

*Mr. Charles J. Parker*, for the defendants George Bailey and Nelson T. Voorhees.

PITNEY, V. C.

The decedent died possessed of two tracts of land situate in Monmouth county. The tract here in question was called the homestead, and consisted of about one acre of land, with a house and barn and some outbuildings; and the other tract was about thirty acres, mainly woodland, situate detached from the house lot. This property was all heavily mortgaged at the time of his decease, and he was indebted besides that to various individuals, mainly to his own children, and, as I infer from the evidence, most of that indebtedness was for services which they had rendered him, with one notable exception, however, namely, that the complainant had been security for him on a note of $250, and had been obliged to pay it in cash. I infer from the evidence that each of these separate tracts was separately mortgaged, and then that there was a blanket mortgage covering both tracts. The administrators applied for and obtained an order to sell the land for the payment of debts, and although

it did not appear affirmatively at the hearing that they were directed to sell the lands free of the mortgages, in point of fact they did so sell them. *In re Voorhees, 12 Dick. Ch. Rep. 291.*

All of the charges of mismanagement of the sale entirely failed. There was a suggestion made that the lot on which the house stood should have been divided and sold in parcels, but no serious request was made to the administrators so to do, and there was no proof made at the hearing that the homestead, as it was called, would have brought a better price if divided, but the contrary appeared. It may be here said that the children were all of age, and lived in the neighborhood.

For the purposes of the sale the administrators caused the woodland to be divided into lots by a surveyor. The property was thoroughly advertised, not only in the formal legal method, but by large posters set up in the neighborhood, and every reasonable effort was made by the administrators to cause it to bring a full price. It was well attended.

There is not the least particle of proof in the case that Captain Curtis, who was a personal friend of Captain Bailey, the defendant, made any bid whatever upon the homestead. Both he and the auctioneer deny it. It was struck off to him by the auctioneer without the least authority on Curtis' part. The fact is that the auctioneer, who was a real estate and insurance agent and a reasonably shrewd man of business, was guarantor on the blanket mortgage upon the premises, and anxious on that account to have the property bring its full value. When the homestead was put up the complainant bid $500 for it. The defendant Captain Bailey said to the auctioneer: "Don't start the property at $500; make it $1,000." The auctioneer then cried it as on a thousand-dollar bid, and then the bids were advanced. So far as the evidence shows only two *bona fide* bids were made after that by separate bidders, the auctioneer crying fictitious bids that were never made, until he got a *bona fide* bid of $1,500 from a Mr. Longstreet, who owned the adjoining property; then another of $1,525 from a Mr. Austin Voorhees (not a relative of the heirs), who lived in the neighborhood and desired to buy; then he cried it on a bid of $1,550, which was made

by no person, and, when he could not get a further bid, was obliged to strike it off on that bid, and without any authority from Curtis whatever declared him to be the purchaser. Curtis assented thereto, but shortly afterwards, Bailey, being apprised of the situation, assumed the bid, and said he would take it at that price. The sale, however, was reported to the orphans court as having been made to Captain Curtis, and was so confirmed, and a deed was actually made and executed by the administrators to Captain Curtis.

There was not the least concealment of the fact that Captain Bailey, the defendant, had taken the bid from Captain Curtis and become the real purchaser. He himself at once avowed it, and, as far as appears, it was known to all the heirs. The complainant knew of it at once, and Captain Bailey took immediate and open possession.

No objection was made to the confirmation of the sale on account of its having been improperly conducted, that it did not produce a sufficient price or that it had been made in reality to Captain Bailey. All persons interested seemed to be satisfied with it, and it was duly confirmed by the court on April 29th. Shortly after the sale the administrators filed their account, charging themselves with the purchase price.

A dispute then arose among the heirs as to their several claims, and Captain Bailey got them together and induced them to agree among themselves as to how much their various claims should be. After this was done a large batch of exceptions was filed by complainant to the administrators' account in the orphans court, which, of course, produced litigation, and when the whole thing was finally settled the net amount of the estate remaining was only sufficient to pay a fraction short of eighty cents on the dollar on the several claims.

After this litigation in the orphans court, and on the 19th of April, 1898, more than a year after the sale, the complainant filed his bill for relief against the sale itself.

The value of the property was gone into, and while one or two witnesses swore that it was worth $2,000 or upwards, the great weight of the evidence was that $1,550 was a full price for it.

I am satisfied from the evidence that Captain Bailey is truthful in his sworn statement that he had no expectation or desire to purchase the homestead property; that he gave no authority to Captain Curtis or to the auctioneer to bid for it; that there was no arrangement between them that he should bid in the property for him, and that Captain Curtis did not bid on it at all, but that it was really the bid of the auctioneer. The latter swore that if Captain Curtis had not assumed the bid he, the auctioneer, would have assumed it.

There is another set of facts introduced into the case by the defendant Bailey's answer, which seems worthy of notice. While he had no idea of purchasing the homestead, he did desire to purchase, and did purchase through Captain Curtis, one of the pieces of woodland. Captain Curtis, at his request, bid upon that property, which was put up and struck off before the homestead. He was outbid by one Cook, as the auctioneer declares, who denied that he made the bid, and it was struck off to Curtis, and Curtis subsequently conveyed it to Captain Bailey. Now, strange as it may seem, I am satisfied that Captain Bailey was not aware that he was, in this action, doing anything wrong, dishonest or contrary to the principles of a court of equity. The fact, which I think came to the knowledge of the auctioneer, that Captain Curtis had just bid off the piece of woodland for Captain Bailey emboldened the auctioneer to declare Curtis to be the purchaser of the homestead without any authority from either.

In this case, as in the other, there was no concealment, and as soon as the sale was confirmed he proceeded to expend a considerable sum in clearing and fertilizing it.

Captain Bailey, in his answer, sets out this purchase by him of the woodlot, and offers to give up the title to both properties if made whole for the amount of improvements he had put upon each. Complainant, however, declared at the hearing that he was satisfied with the sale of the woodlot, and did not wish to disturb it.

Not only did Captain Bailey, as I have stated, avow himself the purchaser immediately after the sale, but he took immediate

possession, and as soon as the sale was confirmed by the orphans court he commenced to make improvements, and spent upon the property a little over $200 in cash or its equivalent, and has paid the accruing taxes.

Besides these improvements he purchased an adjoining piece of land situate in the rear of the homestead, and which, united with it, greatly increased the value of both. In fact, the homestead lot was ill-shaped. It was an isosceles triangle, or nearly so, with a narrow base, and one of the long sides bounded on the highway, so that it had but little depth. After making this addition he moved one of the outbuildings of the Voorhees lot up to and adjoining the barn, and placed it so that a portion of it now stands upon the adjoining lot, since purchased by him. The changes he has made are such as to render the outbuildings suitable for use in connection with a small farm, rather than for a mere dwelling-house and garden spot. Of course, in order to separate the homestead from the additional purchase, it will be necessary to again move the outbuildings above mentioned, and it is to be inferred that the purchase of the land in the rear of the homestead would not have been made but for use in connection with it.

The fundamental principle governing all dealings with property held in trust is that the *cestui que trust* is entitled to the best efforts of the trustee to further in all legitimate ways the interests of the *cestui que trust*. It is the duty of the trustee to use and exercise such care and diligence in dealing with the trust estate as a prudent, sagacious man would bestow upon his own. The trustee is not permitted to have any interest in the subject of the trust antagonistic to, or in any degree inconsistent with, that of the *cestui que trust*. It follows from this that where there is a trust for sale, the trustee cannot become, either directly or indirectly, a purchaser at his own sale, even though the sale be at auction and so conducted as to insure the best price, and in point of fact the price actually paid appears to be a fair and full one. The principal reasons for extending the restriction so far are: (1) that the trustee shall not be subjected to the least temptation to abate any reasonable efforts to procure

the best price for the trust property; (2) the danger that the trustee may have become possessed, in the course of his dealing as trustee, of some secret information of facts and circumstances affecting the value of the trust property, of which he may take advantage for his own benefit; and (3) the difficulty of ascertaining whether in fact all proper efforts have been made by the trustee to procure the best price.

It is at once apparent that it is of the essence of this rule that the obnoxious inconsistent position of the trustee should exist before or at the time of the sale, which period, in a sale at auction, is the moment of striking off the property to the highest bidder and declaring him the purchaser. The trustee must entertain the intention or desire to purchase before or at the moment of the sale in order to place himself in a position antagonistic to his *cestui que trust*.

If the trustee advertises and prepares for sale with proper care and diligence, and in good faith, without entertaining the least intention or expectation of becoming a purchaser, and, in case of a sale at auction, does not in fact, directly or indirectly, bid for the property, and it is struck off in good faith to another person, then there is a complete absence of any of the elements of danger to the interests of the *cestui que trust* which underlie the restrictive rule in question.

The leading authorities in this state which support the foregoing propositions are the following: *Scott* v. *Gamble, 1 Stock. 218* (at *pp. 235, 236*); *Mulford* v. *Bowen, 1 Stock. 797* (at *p. 798*); *Staats* v. *Bergen, 2 C. E. Gr. 554* (at *pp. 558, 559, 560*); *Bassett* v. *Shoemaker, 1 Dick. Ch. Rep. 538*, and cases there cited; *Wortman* v. *Skinner, 1 Beas. 358* (at *pp. 371, 372*). I will quote the language of the late Justice Vredenburgh, in speaking for the court of errors and appeals in the last case cited (at *pp. 371, 372*), since it is relied upon by the defendant herein: "Let us first see, before considering the evidence, what this doctrine, as applied to the case before us, really is. My understanding of it is this: That if an administrator, at public or private sale, sells land to another, upon an agreement made before or at the sale, that such person shall buy or bid off not for

Voorhees *v.* Bailey.

himself or for others, but for the administrator, that the pur-
chase-money is to come from him, and the deeds made from him
to the bidder, and by the bidder back again to the administrator,
in pursuance of said agreement, then equity will set aside the
proceedings as fraudulent in law. But if the purchaser bids
not for the administrator but for himself, or for the heirs of the
deceased, or for anybody else, then the principle does not apply.
The rule was made from considerations of public policy, to pre-
vent the land from being sold under value by the secret machina-
tions of the administrator; and therefore such agreement and
arrangement must be made and exist before and at the very in-
stant of the sale. Any agreement made, however soon after it
is struck off by the administrator to the purchaser, is not within
the letter, the spirit, or the meaning of the rule. The rule has
then had its operation upon the sale, and the land is again in-
stantly free for all the world to purchase. The very reason for
establishing the original rule requires this construction of it,
otherwise it would produce the very evil it was intended to
guard against, by restricting to that extent the power of the
purchaser to alienate. Applying these principles to the case
before us, if Cooper and Emmons, on the 2d of July, 1825, bid
off this property for the complainant, which was carried out by
the subsequent execution of the deeds to the complainant, then
the complainant was at that time, and has been ever since, but a
trustee for the defendants, and his title is voidable in equity.
But if such was not the fact—if the purchase was made on the
2d of July, 1825, not for the complainant or for his benefit, but
for the benefit of Cooper and Emmons, or of the heirs of N.
Skinner, and the deed from Cooper and Emmons to the com-
plainant was by virtue of an arrangement made after the 2d of
July, 1825, then there was no legal fraud in the transaction.
Immediately after the property was struck off on the 2d of
July, 1825, the complainant had as good a right to buy from
those to whom the property had been struck off as anybody
else, and it would then be in him fraud, neither actual nor
legal."

In that case the property was struck off by Wortman, the

administrator, to two purchasers who were mere nominal bidders,
even if they bid at all, at the best price to be had at the time,
but which was not satisfactory to the heirs; the object being to
have the affair in such shape as to be able to make title at any
moment when a purchaser at a satisfactory price could be ob-
tained without incurring the expense of a re-advertisement.
Several years afterwards the administrator bargained with a
portion of the heirs for the premises at an advance over the
amount bid, procured the original sale to be confirmed, made a
conveyance to the original nominal bidders, who at once conveyed
to him, and accounted to the orphans court for the amount of
the advanced price for which he bargained with some of the
heirs, and used the consideration money to pay the debts of the
deceased, most of which he had already advanced out of his own
pocket. Though the facts of that case are somewhat different
from those in hand, yet it is quite difficult to distinguish it in
principle. In both cases there was absent the important obnox-
ious element of previous intention on the part of the trustee to
become a purchaser; in both there was no actual sale to the
nominal bidder; in both the trustee became the purchaser after
the bidding was closed and a purchaser declared. But in the
older case years elapsed before the trustee intervened to purchase,
and in the present but a few moments of time. There were
other circumstances in the older case which may have influenced,
and probably did influence, the minds of the judges.

Under these circumstances I feel disinclined to hold that the
present case is governed by that of *Wortman* v. *Skinner.* I am
afraid that the precedent so set might lead to abuses and open a
way by which trustees might actually manage to become pur-
chasers at their own sales in pursuance of a previous intention,
without being detected in so doing. I therefore decline to decide
the case on that ground.

But there is another ground upon which I think the defendant
must prevail, and that is acquiescence and practical confirmation
of the sale.

While it is of the greatest importance for the security of in-
fants and other helpless persons that the strict rules governing

the conduct of trustees shall not be relaxed, it is equally important in administering those rules to bear in mind that trustees have the same right to equitable treatment at the hands of *cestuis que trustent* that the latter have against the former.

In the case in hand the complainant and the other *cestuis que trustent* had the option either to hold Captain Bailey to his purchase and require him to hold the title and charge himself as administrator with the purchase price, and thereby affirm and confirm the sale, or to disaffirm the sale, object to its confirmation by the orphans court, and refuse to accept, directly or indirectly, the purchase price. This option, in my judgment, it was necessary for such of them as had knowledge of the facts (all were adults) to promptly exercise. Apparently all, unless we except the complainant, did exercise their option to have the sale stand and require the administrators to charge themselves with the purchase price. And, in my judgment, the same must be said of the complainant. If he intended to disaffirm the sale and have it set aside on the grounds now sought, it was, in my judgment, his duty to do so promptly. He could not speculate—wait in silence to see which course was most to his advantage—while Captain Bailey was acting in good faith on the assumption that complainant was satisfied with the sale.

It must be remembered that complainant was not laboring under any disability or lack of knowledge of the true state of the case; and when the sale was confirmed by the orphans court, without the least objection on his part or that of anyone else, it seems to me that Captain Bailey was entitled to conclude that the sale was approved and accepted by the complainant as well as by all the other adult heirs, and was justified in proceeding to make the improvements and changes on and in the premises which he did.

If there had been any actual conscious misconduct on Captain Bailey's part upon which he might be properly charged with actual fraud, the conclusion just stated might not—I do not say would not—result.

But the facts show the contrary.

We have seen that there was no previous intention on the part

of Captain Bailey to become the purchaser of this lot. We have seen that he used every reasonable endeavor to procure a full price for the premises. In all that his conduct is entirely above criticism. We have seen also that there was no concealment on his part. The complainant himself swears that he heard Captain Bailey almost immediately declare that he had become the purchaser. We have seen that he immediately took possession and acted as owner; we have seen that the sale was duly confirmed by, and that he accounted for the purchase-money to, the orphans court, and that the heirs-at-law, who are the principal creditors, have had the benefit of that money. The complainant was cognizant of the fact that Captain Bailey took possession, and does not deny that he saw him making improvements. Those improvements were of a character which will render it difficult to adjust the value of them as between Captain Bailey and the complainant if the sale shall be set aside. They are, as we have seen, not such as to improve the house and lot as such, but to render it more convenient for use in connection with the cultivation of a small farm, to which Captain Bailey has devoted it. He appears to have purchased land in the rear of the lot in question, to use in connection with it, and to have so arranged one of the buildings in connection with this additional purchase that it will be difficult to disconnect it without loss.

The counsel of complainant was asked during the progress of the case why objection was not made to the confirmation, or the bill filed sooner, and the only excuse he could make was that the deed from the administrators to Captain Curtis was not promptly put on record, and he had no certain knowledge that Captain Bailey was the purchaser. But this want of knowledge is contradicted by the facts in the case which, as we have seen, show that the complainant knew that Captain Bailey was the purchaser and took immediate possession and spent money upon the premises. Besides, in my judgment, it was his duty to make his objection to the judicial confirmation of the sale.

The facts with regard to the deed from the administrators to Curtis, not being put immediately upon record, are these : The deed for the home lot was prepared by the auctioneer, the deeds

Voorhees *v.* Bailey.

for the woodlots were prepared by the surveyor, who made the partition for the purposes of the sale, and they were executed at different times and became separated. The surveyor, who had charge of the woodlots, saw that those deeds were immediately recorded. The deeds from Captain Curtis to Captain Bailey were not executed at the same time that the deeds from the administrators to Curtis were executed, but a few days intervened; and while the deed for the homestead from Captain Curtis to Captain Bailey was almost immediately recorded, that from the administrators to Curtis for this lot was left in the hands of the auctioneer for record and was mislaid by him. That there could have been no object in keeping the deed from the records is manifest from the fact that the one to Captain Curtis for the woodlot was immediately recorded. I think the excuse that the deed was not put on record is entirely insufficient to account for the complainant's delay and that it is in this case inexcusable.

That the facts above stated are sufficient to charge the complainant with acquiescence and confirmation we have the authority of *Scott* v. *Gamble, supra.* There a sale was made in 1843 by an executor, under power in the will, and of course was not judicially confirmed. The fund produced belonged to the complainants, who were then infants. After they had arrived at age, and three or four years after the sale, and with full knowledge of all the facts, they accepted the bonds which were given by the trustee for part of the purchase-money, in payment of their shares of the estate. The circumstances are set forth in *1 Stock. 241, 242,* and Chancellor Williamson (at *p. 242*) uses this language, which I think applies here: "The question arises, under these circumstances and after having received, with full knowledge of the facts, the proceeds of the sale, is the complainant entitled to have the sale set aside, and a resale of the property? The fact of her having received the purchase-money is not an absolute estoppel to the complainant's right of avoiding the sale, for no matter what the ratification by her might have been, whether by the mere receipt of the purchase-money, or by a more solemn act of release under seal, if

20

such ratification had been without a knowledge of the facts, and in ignorance of her rights, it would be no obstacle to her obtaining relief. But, on the contrary, when such act of ratification is done with deliberation, and with a knowledge of the fact which would avoid the sale, it is a bar to any relief which this court might otherwise have afforded."

It is true that in this case no money was paid directly to the complainant as the price of the land, but in effect it was so paid, for the complainant was an heir-at-law and one of the creditors of the estate and the money was accounted for and paid and he received his share, whether in the shape of his claim against the estate, or in the shape of the payment of the debts of the decedent, it seems to me matters not.

Chancellor Williamson cites, in support of his opinion, the case of *Benson* v. *Bruce, 4 Des. 463,* decided by the court of appeals of South Carolina, which held that the mere receipt by an adult of the price of land agreed to be sold by his mother during his infancy was a confirmation of the contract and bound him to convey in pursuance of his mother's agreement.

The argument from *Scott* v. *Gamble* to the present case is *a fortiori,* for in that case the complainant was a helpless infant female at the time of the sale and was not chargeable either in fact or in law with knowledge of the facts of the case, which showed an actual contrivance by the husband of the executrix to have the premises sold and conveyed to a third person as a figurehead, and by him to the husband. It was in fact somewhat similar, in some of its aspects, to *Bassett* v. *Shoemaker, supra.* The case was put by the learned chancellor solely on the ground of the acceptance of the purchase price by the complainants after they became of age with knowledge of the facts. As to the effect of complainant standing by in silence while Captain Bailey made his improvements, I refer to *Sumner* v. *Seaton, 2 Dick. Ch. Rep. 103* (at *p. 111 et seq.*), and authorities there cited.

I am of the opinion that the complainant's case fails, and will advise that the bill be dismissed, with costs.